The opinion of the Court was delivered by
Dunkin, Ch.
The origin and history of what is sometimes termed the Clergy Society of the Independent or Congregational Church, is set forth in the former decree in this cause. 8 Rich. Eq. 190. The character of the corporation is described and the general principles applicable to such corporations. In that decree a construction was given to the Act of 1834, to which no objection was taken by the relators, and to which no objection is now taken, The only question submitted for our consideration is, whether the Act of 1834 be a violation of that provision of the Constitution which prohibits the Legislature from passing any law impairing the obligation of contracts.
It would be difficult to say that, in the strict application of *606 the term, there were any founders of the charity, except, as the creator of all incorporations, the State may be regarded as the founder. But, if there were any founders in any other sense, the Circular Church is more entitled to the character than either the members of the Legislature who contributed their pay-bills, or the generous individuals who annually threw in their mite at the Church door. But the inquiry may not be very important. Previous to 1789 the Society had been formed, and the particular occasion of forming it, as well as the general purposes of it, are stated in the former decree. In March, 1789, William Hollinshead, Isaac L. Keith, and Josiah Smith, with other members of the Society, petitioned the Legislature for an Act of Incorporation. If the petitioners did not prepare the Act which was then passed, it is not too much to presume that they, and all other persons interested in the charity, approved of the action then adopted by the Legislature in response to the petition. If the terms of the charter had been unacceptable — if the powers granted were too restricted, or, on the other hand, were too general and indefinite, the Society may, perhaps, have declined to accept it. The funds of the Society at that time were inconsiderable, if any fund actually existed. The charter was accepted, acted upon, and remained unchanged from that time until the year 1834. All the funds of the Society, worthy of any notice, accrued subsequent to the Act of Incorporation in 1789. By the second clause of this charter it is declared that “it shall, and may be lawful for the said corporation hereby erected, to take and hold, to itself and to its successors, forever, any charitable donations or devises of lands aud personal-- estate, and to appropriate the same for the benefit of the said corporation, in such manner as may be determined by a majority of the members thereof.” It was truly argued by the appellants that “ a corporation, created by statute, possesses only those properties which the charter of its creation confers upon it, either expressly or as incident to its very existence, and that it derives all its powers from that Act, and is capable oi *607 exerting its faculties only in the manner which that Act authorizes.’’ Head and Amory vs. Providence Insurance Company, 2 Cranch 127; Dartmouth College case, 4 Wheat. 636. If the Court look only to the language of the charter it would be difficult to affirm that the defendants might not be justified by the literal provisions of the Act of 1789 if that Act were still in existence. But it is said that the title of the Act and the preamble all demand that these powers should be construed in a limited sense, and in reference to the subject matter that the funds should be applied for the specific purposes for which the original Society was instituted, and that they can be applied by the corporation, in no event, for any other purposes. The argument is entitled to great consideration, and, to a certain extent,' is well founded. If, instead of fulfilling the objects of their creation, the majority of a corporation should disregard, or neglect, those objects, and pervert their funds to other purposes, the ordinary tribunals of the country have the authority, and it would be their duty to correct the abuse. But this scarcely meets the case. If the funds collected by a corporation have accumulated to an amount which not only enables them to carry out and perfect the work which gave rise to their creation but to leave a surplus, it may then become the subject of legitimate inquiry by the corporation, wh.etber under the powers granted by the charter, they have authority to employ such surplus; or, if the object of their creation was fully accomplished, their charter should be surrendered, or subjected to forfeiture for non user.
It is not proposed to recapitulate the history of this charityj But in 3 789, and for some years afterwards, several churches fell under the denomination of Independent or Congregational, and the funds of the society were very limited. In process of time, through the benevolence of individuals and the judicious and careful management of the officers of the corporation, the fund greatly increased, while the numbers of *608 churches of this denomination diminished, and the objects of the bounty of the society, never numerous, had become very few. As early as 1815, Dr. Ramsay was able to say that the objects, within the strict letter of the Act, did not exceed one half of the interest of the capital fund. Seeing this accumulation, the society first adopted a resolution discontinuing the annual collection at the church door. But the fund still increased so as, at one time, to have amounted to seventy thousand dollars, with few or no objects entitled to its bounty.
Under these circumstances the society, in 1834, were driven to the inquiry, what disposition should be made of this surplus fund, continually increasing, while the original purpose of its creation had almost ceased to exist. They had already made some slight appropriations to aid the distressed families of clergymen not falling within the strict description of this denomination, and for other purposes, and latterly larger sums had been appropriated, which had excited the doubts of the more cautious, and which, therefore, stimulated and justified the inquiry.
Those who had sanctioned these appropriations, supposed that the society had the authority, under the general powers granted by the charter of 1789, while all saw the inconvenience arising from an overgrown, unemployed fund, if not the ultimate danger to the charter from a non user of their powers. Whatever difficulty might appear in the construction of the Act of 1789, no doubt existed as to the power of a corporation to surrender its charter. It is one of the incidents of a corporation, and is so stated by the elementary writers, 4 Rep. 77. What were the various motives which may have influenced the members of the society in applying for the passage of the Act of December, 1834, or what were the motives of the several members of the legislature in passing that Act, (as was stated in the decree of 1856) it is not the province of the Court to inquire. The charter of 1789 was thereby sur *609 rendered by the corporarion and accepted by the legislature. The society was re-chartered for twenty-one years. According to the construction heretofore given to the Act of 1834, all the objects of the bounty of the society, under the Act of 1789, all the obligations of the corporation of 1789, in regard to those objects, are embraced and secured by the Act of 1834. The Act of 1789 had provided that the corporation might appropriate “ the funds for the benefit of said corporation in such manner as might be determined by a majority of the members thereof.” The Act of 1834 authorises the corporation “ to appropriate the funds to such charitable, benevolent, religious and other purposes, for the benefit of the said corporation, and of the said Independent or Congregational Church in the city of Charleston, in such manner as might be determined by a majority of the members thereof.” It is very difficult to perceive that this is any enlargement of the general powers vested in the Corporation of 1789.
But if the charter of 1789 had merely provided that the , funds to be collected should be applied by the corporation to the relief of disabled ministers of this denomination, and had vested the corporation with no further or general powers as to the appropriation of these funds, it does not necessarily follow that the Act of 1834 is repugnant to the provisions of the Constitution. Individuals might set about to collect funds for building such an establishment as the Greenwich Hospital on the Thames, or the Roper Hospital in Charleston, with the condition or upon the confidence that the expense of maintaining and conducting the same would be defrayed by Government, and they obtain a charter, authorizing them to apply their funds to the erection of such edifice. Through the charitable donations of individuals, collections at the churches, jurors certificates, &c., in the course of years, while the buildings are being constructed, three times the amount necessary for the purpose may come into the hands of the corporation. When the buildings are completed the coporation would *610 become functus officio, and might properly be dissolved, or the charter surrendered. In either event the corporation would cease to exist, and while the real estate, if any, of the corporation would revert to the grantor, the personal assets, according to the better opinion, would vest in the State. But prior to such event, and in anticipation of it, the corporation apply to the legislature for such amendment of their charter as would authorize them to hold and appropriate their funds also for the purpose of assisting in defraying the expenses of the hospital, or some kindred purpose. In the opinion of the Court it would be competent for the legislature to grant such amendment without the violation of any contract, express or implied. Any individual, throwing in his contribution under the original charter, does it with that implied understanding, and gives up his entire interest in the gift to the corporation. According to the shewing of the relators, the capital of this corporation in 1834 amounted to eighty-five thousand dollars, aud, for more than twenty years preceding, there had been none, or comparatively few beneficiaries entitled to the bounty. Twenty-five years have since elapsed, and it was stated at the hearing that there is not now, nor had been for several years, a single beneficiary, and that the funds, after deducting all the alleged abrasions, now exceeded forty thousand dollars. The appropriations of which the relators complain have been chiefly for the permanent improvement of the Church edifice in the body of which the society was formed, and by the bounty and active benevolence of whose members the resources of the society were, in the main, originally contributed, and have-been faithfully and successfully managed. It was not unbefitting that, in seeking an amendment of their charter, and in enumeratingthe charitable, benevolent and, religious purposes,” to which they asked the sanction of the legislature fin appropriating their funds, the society should gratefully remember and piously designate the Independent or Congregational Church in the city of Charleston, commonly known as the Circular Church.
*611 In the judgment of this Court the Act of 1834 presents no violation of the inhibition of the constitution, and it is so directed to be certified to the Court of Chancery.
O’Neall, Wardlaw, Withers, Whitner and Glover, Jj., and Wardlaw, Ch. concurred.